IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SANDRA LOUISE DAMIT, )
)
Plaintiff, )      No. 14 C 1032
)
v. )      Magistrate Judge Mason
)
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security )
)
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Sandra Louise Damit ("Damit" or "claimant") brings this motion for

summary judgment [18] seeking judicial review of the final decision of the Commissioner

of Social Security ("Commissioner"). The Commissioner denied Damit's claim for

disability insurance benefits under the Social Security Act (the "Act"), 42 U.S.C. §§ 416

and 423. The Commissioner has filed a cross-motion [26], asking that this Court uphold

her previous decision. This Court has jurisdiction to hear this matter pursuant to 42

U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary

judgment is denied and the Commissioner's cross-motion is granted.

I.      BACKGROUND

A. Procedural History

On March 11, 2011, Damit filed an application for disability insurance benefits,

alleging disability beginning on February 21, 2011. (R. 56.) Her date of last insured

was December 30, 2014. (Id.) The claim was initially denied on June 14, 2011, and

upon reconsideration on October 11, 2011. (R. 117-19.) Damit then requested a hearing, which was held on December 6, 2011 before ALJ Carla Suffi. (R. 82.) On November 2, 2012, the ALJ issued a decision denying Damit's disability claim. (R. 82-94.) The Appeals Council subsequently denied her request for review on December 20, 2013. (R. 1-3.) Damit then filed this action in the District Court.

## B. Medical Evidence and Records

Claimant seeks disability insurance benefits for the following impairments: mood disorder, mild mental retardation, somatization, diabetes, obsessive compulsive, hostility, interpersonal sensitivity, depression and arthritis. (R. 56.) Because the parties' briefs only raise certain issues regarding her mental impairments, the Court will only recite the facts from the administrative record that are relevant to those issues.

### 1. Dr. Terrence McGovern

Dr. Terrence McGovern, a psychologist, performed a psychological evaluation of claimant on October 5, 2010. (R. 271-77.) He noted that she presented with suspected learning disorders and Type II, non-insulin dependent diabetes. (R. 271.) He also noted her thought process was limited, but she was overall logical, well-ordered and relevant. (*Id.*) Her speech was fluent and she articulated without difficulty. (*Id.*) Her appearance and eye contact were also appropriate. (*Id.*) She reported to him that she had learning problems, and that in school she was placed in regular classes but also received some resource help. (*Id.*) She also received speech therapy due to articulation problems. (R. 272.) She currently takes prescription medications for high

blood pressure and cholesterol, and to control her blood sugar and help modify her moods. (*Id.*)

Dr. McGovern administered the Wechsler Adult Intelligence Scale (WAIS) test to measure her cognitive ability. (R. 272.) Damit scored in the "borderline range" for verbal comprehension (score of 78) and processing speed (score of 79). (*Id.*) She scored in the "extremely low" range for perceptual reasoning (score of 69) and working memory (score of 66). (*Id.*) Her Full Scale IQ score was also in the "extremely low" range (score of 68). (*Id.*) Dr. McGovern also administered the Wide Range Achievement Test and noted that Damit performed "significantly below expectations on one of the measures based on her aptitude." (R. 274.) She scored a 76 in word reading (5th percentile and grade 5.2), a 74 in sentence comprehension (4th percentile and grade 6.5), an 85 in spelling (16th percentile and grade 7.9), and a 61 in math computation (less than 1st percentile and grade 2.7). (*Id.*) Her "overall ability" score on this test was a 68 and Dr. McGovern opined that these results were "consistent with a diagnosis of learning disorders." (R. 275)

Dr. McGovern also administered a personality test, and he opined that the results "were consistent with persons who are suffering from a mood disorder." (*Id.*) He believed she should be referred to a psychiatrist to assess the need for medication and supportive counseling. (*Id.*) Dr. McGovern assessed her career interest and noted that she is interested in business related occupations. (*Id.*) The results of her Career Assessment Inventory "revealed a poorly differentiated profile in which she endorsed some interests in the conventional occupational themes," including office, clerical and

3

food service occupations. *(Id.)* Dr. McGovern opined that she would be suited for some of these occupations but "it is recommended that any career choices should be discussed within the context of appropriate career counseling." (R. 276.) Dr. McGovern also opined that her results as a whole "are consistent with persons who have been diagnosed with mild mental retardation." *(Id.)* His report stated that she is "capable of some further training for jobs that are well-structured and have a minimum of ambiguity." *(Id.)*

### 2. Dr. John Brauer

Dr. John Brauer, another clinical psychologist, completed a disability evaluation of Damit. (R. 290-94.) In his report, he summarized Damit's statements about her conditions, including Dr. McGovern's findings. (R. 290.) He noted that Damit was a high school graduate who attended mainstream classes with additional help from the resource center throughout her schooling. *(Id.)* She started community college but she dropped out before the end of the first semester. *(Id.)* She worked as a full time cashier at Walgreens for four years, beginning at the age of 21. *(Id.)* Subsequently, she worked as a cashier at Giant Auto Parts, and at Target as a stocker, cashier and in customer service for three and a half years. (R. 290-91.) After she left Target, she worked at HSBC doing secretarial and office work for nearly 7 years before she was laid off. (R. 291.) She then found a job with another company in accounts receivable where she remained for three years until she was again laid off. *(Id.)* She reported that she had never been fired for performance, an inability to do her job or for mental health issues. *(Id.)*

4

With respect to her current level of functioning, Dr. Brauer reported that she lives in a house in Joliet, Illinois with her husband and his brother and uncle. (*Id.*) At the time, she was not working and she reported spending her time looking for work, watching television, and making dinner. (*Id.*) She also reported having few hobbies or interests, and she was not very social. (*Id.*) She manages her funds on her own without difficulty. (*Id.*)

Dr. Brauer's observations were as follows: he noted that she arrived on time, had traveled to his office on the bus from approximately 50 miles away without difficulty and she was appropriately groomed and attired. (*Id.*) She was alert, well-oriented and cooperative with the evaluation process. (*Id.*) Her speech was clear and logical, and she appeared to give a strong effort during the evaluation without showing any signs of fatigue, discouragement or other extraneous factors. (*Id.*)

Damit's scaled scores on the WAIS-4 subtests were as follows: Verbal Comprehension - 18, Perceptual Reasoning - 15, Working Memory - 8, Processing Speed - 21 and Full Scale IQ - 62. (R. 292.) These scores placed her in the "extremely low" range of intellectual functioning for working memory, in the "borderline range" for verbal comprehension, perceptual reasoning and Full Scale IQ, and in the "average range" with regard to processing speed. (R. 292-93.) He noted that her concentration and attention were poor, and her general fund of knowledge appeared "impoverished." (R. 293.) Her capacity for abstraction was also "very poorly developed," and she demonstrated limited capacity for classification and categorization. (*Id.*) He noted that Damit's judgment appeared "grossly appropriate for simple situations" but that she was

5

likely to experience difficulties with judgment in situations that were more complex or nuanced. (*Id.*) He also believed she would have difficultly managing funds on her own behalf. (*Id.*)

## C. Claimant's Testimony

Damit testified at the hearing before the ALJ on August 28, 2012. (R. 14-31.) She was represented by counsel. (R. 17.) At the time of the hearing, Damit was 41 years old, she was about 5 feet, 9 inches tall, and she weighed about 296 pounds. (R. 21.) She currently lives with her husband and 16-year old step-son. (R. 22.) She does not drive because she never got her license. (*Id.*) She typically gets from place to place on the bus or her husband drives her. (R. 23.) She testified that she does have some problems walking, standing or sitting for a long time because of her left ankle. (*Id.*)

Damit testified that she was educated through high school, and some of her classes there were in special education. (R. 22.) She can read and write although she sometimes needs assistance. (R. 23.) She can read newspaper articles but has some difficulty understanding them. (*Id.*) She enjoys reading mysteries for pleasure, and her favorite author is John Grisham. (*Id.*) When she reads a novel she is able to understand the gist of what is happening in the book even if it is difficult for her to understand everything she has read. (*Id.*) At the store, she is unable to figure out change when paying a cashier. (*Id.*) She is able to do simple addition and subtraction if she can use her fingers. (*Id.*)

Damit testified that she is not currently working, although she volunteers one to two days a week at PetSmart, where she helps with feeding and playing with the cats,

as well as cleaning cages and liter boxes. (R. 24-25.) While she is at PetSmart she does lift the cats, and she can stand or sit whenever she wants. (R. 25.) She stated that she is usually standing for about 30 minutes in a three hour period while she is there, and the rest of the time she is sitting. (R. 26.)

Damit reported that in the past, she held a job as an accounts payroll clerk. In this position, she filed paperwork, checked invoices, and replaced office supplies. (R. 26-27.) The heaviest item she lifted at this job was a box of paper. (R. 27.) She was also employed by HSBC, where she was on the documents support team, doing data entry, filing banking documents or pulling documents for a client, a branch or a lawyer. (*Id.*) Damit also worked at Target for a few years on the sales floor and at the register. (*Id.*)

When asked about whether she has had any difficulty in the work place because of her learning disabilities, Damit reported that it takes her a while to pick something up, but once she does it over and over, she "gets the hang of it." (R. 28.) She stated that she was happy with her work performance in her past jobs. (*Id.*) Physically, she now has problems with sitting for a long time, standing and lifting. (*Id.*) She has pain in her left foot, her lower back, and her right shoulder. (R. 29.) Her pain gets worse when she walks for a long time, and rest and medication give her some relief. (*Id.*) She is currently taking muscle relaxers and she needs to rest a couple of times a day for thirty minutes. (R. 30.) She has been to physical therapy on one occasion and she has never tried anything else for her pain. (R. 31.)

At the time of the hearing, Damit was using a wheelchair because she had surgery on her ankle and she was having difficulty with crutches. (*Id.*) She also uses orthotics for other issues she has with her feet. (*Id.*) She believes she could stand in one place, such as a counter, if she could move around a little bit for about a half hour. (*Id.*) She would be able to walk for five to twenty minutes and she could sit for a half-hour until she had to get up. (*Id.*) Her right arm hurts if she uses it for a long period of time or if she lifts heavy things. (R. 33.)

Damit has no problems with depression and she had been seeing a psychiatrist to handle mood swings and control her temper; however, her doctor retired and she has been too busy to find a new one. (R. 33-34.) She stated that she is shy, she does not like being around people and she does not communicate very well. (R. 34.) She also reported that she has trouble with her memory at times. (*Id.*) She spends her days doing laundry, cooking dinner, straightening up the house and looking for a job on the computer or in the newspaper. (*Id.*) In three years, she has not been able to find a job. (R. 35.) When she is doing housework, her back starts to bother her, she experiences sinus issues with dust, and she is not able to bring the laundry up and down the stairs due to pain in her back, knees and foot. (R. 36.) She grocery shops with her husband because she believes if she were alone she would over spend or not be able to carry everything. (*Id.*) Her husband balances the check book. (R. 37.)

### D. Vocational Expert Testimony

Vocational Expert Kari Seaver also testified at the hearing. (R. 46.) In analyzing Damit's prior work history, she classified her position as a retail sales attendant as light

8

and unskilled; file clerk as light semi-skilled, and payroll clerk, as light and semi-skilled. (R. 48.) In her first hypothetical, the VE was asked to consider an individual who is younger with a high school education with some special education supports, and with a residual functional capacity to perform light work, subject to the following limitations: can occasionally stoop, kneel, crouch, and crawl, and climb ramps and stairs; can never climb ladders, ropes and scaffolds, can occasionally reach overhead with the right upper extremity, can understand, remember and carry out simple instructions, can make simple work related decisions, but not work with the general public, and no work requiring greater than fifth grade reading level; and can perform tasks that do not require math skills or basic second-grade level computations. (*Id.*) The VE stated that the individual would not be able to perform any of claimant's past work as a retail sales clerk, a file clerk or a payroll clerk because these would require occasional public contact and more than simple decision making. (*Id.*) She also testified that there were other jobs that would work for this hypothetical individual, including hand packer, assembler, or sorter. (*Id.*)

The ALJ then asked the VE to consider the individual in the first hypothetical who also had the additional limitation of needing only sedentary work with the same additional limitations. (R. 49.) The VE again found there would be jobs in the local economy for this individual including sorter, assembler and bench packager. (*Id.*) The VE stated that these jobs are not fast-paced production jobs. (*Id.*) However, if the individual required a job that was not in production, there would be no jobs available without a public contact element. (*Id.*)

9

## II. LEGAL ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). When reviewing this decision, the court may not engage in its own analysis of whether the claimant is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). We must affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842). In addition, "the ALJ must explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Mladucky v. Colvin*, No. 13 C 5324, 2014 WL 3584326, at *2 (N.D. Ill. July 24, 2014).

Moreover, "although the Court affords great deference to the ALJ's determination, it must do more than merely rubber stamp the ALJ's decision." *Id.* "The Court must critically review the ALJ's decision to ensure that the ALJ has built an accurate and logical bridge from the evidence to his conclusion." *Id.* In addition, we must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting

*Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and we will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Clifford*, 227 F.3d at 869. The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.3d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits rests on a determination of whether the claimant is disabled under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the

burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

In this case, the ALJ followed the five-step analysis in denying Damit's request for benefits. (R. 84.) At step one, the ALJ found that Damit had not engaged in substantial gainful activity during the period from her alleged onset date of February 21, 2011. (*Id.*) She found that although Damit had been performing volunteer work at PetSmart, because she was not earning an income, this was not considered substantial gainful activity. (*Id.*) At step two, the ALJ determined that Damit had the following severe impairments: borderline intellectual functioning vs. mild mental retardation; learning disorder; major depressive disorder; diabetes mellitus; mild bilateral knee osteoarthritis; mild lumbar degenerative disc disease; spondylolisthesis; degenerative join disease; mild thoracic degenerative disc disease; obesity; hypertension; headaches; right shoulder impairment; left foot metatarsalgia; plantar fasciitis with bilateral flat foot deformity; and mild left ankle degenerative joint disease with sprain and ligament repair. (*Id.*) The ALJ also found that Damit had the following non-severe impairments: endometriosis, status post exploratory laparotomy due to left adnexal mass, and anemia. (*Id.*)

At step three, the ALJ found that Damit did not have an impairment or combination of impairments that meets or medically equals the listed impairments set out in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). (R. 87.) The ALJ addressed the following listings pertaining to her physical impairments: 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 4.00

12

(hypertension and cardiac impairments), and 9.00 (diabetes mellitus). (R. 88.) In this discussion, the ALJ noted why her conditions did not meet the various criteria in each listing. (*Id.*)

The ALJ also addressed the listings pertaining to Damit's mental impairments, namely listings 12.02, 12.04 and 12.05. (*Id.*) She examined the "Paragraph B criteria" (the "Paragraph D criteria" in listing 12.05), which requires at least two of the following restrictions: (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation of an extended duration. A marked restriction is more than moderate, but less than extreme. The ALJ found that in activities of daily living, Damit had a mild restriction, in social functioning, she had moderate difficulties; she also had moderate difficulties in maintaining concentration, persistence or pace; and she had experienced no episodes of decompensation of extended duration. The ALJ included in this discussion certain facts from the record to support her analysis. She concluded that because claimant's mental impairments do not cause at least two "marked" limitations in the relevant categories, or one "marked" limitation along with repeated episodes of decompensation, she did not meet the criteria in these listings. (*Id.*)

She also considered whether the paragraph C criteria were satisfied in listings 12.02 and 12.04. (R. 89) The ALJ determined that the evidence failed to establish the existence of the paragraph C criteria for these two listings. (*Id.*) She also determined that the criteria for paragraph A in listing 12.05 were not met. (*Id.*)

13

At step four, the ALJ examined Damit's residual functional capacity ("RFC") to determine whether she could perform her past relevant work. (R. 79-83.) The ALJ found that Damit had the RFC to perform sedentary work with the following additional limitations: she can only occasionally stoop, kneel, crawl, crouch, or climb ramps or stairs; she can never climb ladders, ropes or scaffolds; she can occasionally reach overhead with her right upper extremity; she can understand, remember and carry out simply instructions; she can make simple work-related decisions; she is limited to no contact with the general public; she is also limited to no work requiring greater than a 5th grade reading level and tasks that do not require math skills or the ability to perform more than simple/basic 2nd grade level computations. (*Id.*) The ALJ ultimately concluded that Damit's complaints regarding the intensity, persistence and limiting effects of her alleged symptoms were not credible to the extent they were inconsistent with the RFC assessment. (R. 90.) The ALJ also stated that the objective evidence established Damit's impairments but it does not support her contention of disability. (*Id.*)

The ALJ concluded that Damit was not capable of performing any past relevant work because "the demands of the claimant's past relevant work exceed the residual functional capacity." (R. 92.) However, at step five, the ALJ relied on the testimony of the VE to determine that even with the RFC determination and the additional limitations, there was work in the local economy that Damit was capable of performing. (R. 93.) Therefore, the ALJ found that she was not entitled to disability insurance benefits. (*Id.*)

Damit now argues that: (1) the ALJ erred at step 3 in failing to find that she met the criteria in paragraph C in listing 12.05; (2) the ALJ's RFC analysis was not supported by substantial evidence because the ALJ did not properly weigh medical evidence in the record; (3) the ALJ improperly assessed her credibility; and (4) the ALJ's Step 5 determination was not supported by substantial evidence. We will address each of Damit's arguments in turn.

### 1. The ALJ's Determination Regarding Listing 12.05 Was Reasonable

Damit first argues that the ALJ failed to properly consider whether she met or equaled Paragraph C in listing 12.05 at step three of her analysis. At step three, "evidence demonstrating the claimant's impairments is compared to a list of impairments presumed severe enough to preclude any gainful work." *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004). In order for a claimant's impairment to meet a listing, all specified medical criteria must be satisfied. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Here, at step three, the ALJ only examined in detail Paragraphs A and D of listing 12.05 but not Paragraph C. Listing 12.05 states: "Intellectual disability refers to significantly sub average general intellectual functioning with deficits in adaptive functioning." Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background and community setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Paragraph C of this listing requires a "full scale IQ score of 60 through 70 and a physical or other mental

15

impairment imposing an additional and significant work-related limitation of function."
20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(c). However, "the ALJ must find a deficit in
adaptive functioning [Paragraph A] *prior* to assessing whether the criteria of paragraph
C have been met." *Washington v. Astrue,* 2014 WL 2135969, at *18-19 (N.D. Ill. May
21, 2014); *Hamilton v. Colvin,* 2015 WL 4729222, at *5 (N.D. Ill. Aug. 10, 2015) ("[t]o
meet listing 12.05, a claimant must satisfy both the opening paragraph's criteria and one
of the standards set out in subsections A, B, C, or D").

Damit argues that she meets the Paragraph C criteria because the evidence in
the record establishes that she has a Full Scale IQ of 68 and because the ALJ found
that she had additional severe limitations. We disagree. In assessing Paragraph C, a
finding of a deficiency in adaptive functioning is a threshold requirement for listing
12.05. *Id.* "This term denotes an inability to cope with the challenges of ordinary
everyday life." *Nory v. Astrue,* 497 F.3d 708, 709 (7th Cir. 2007) (noting that "the key
term in the introductory paragraph of section 12.05 of the regulation... is 'deficits in
adaptive functioning.'"). Adaptive functioning involves behavioral areas such as
"communication, self-direction, self-care, home living, social/interpersonal skills, use of
community resources, self-direction, functional academic skills, work, leisure, health,
a[n]d safety." *Witt v. Barnhart,* 446 F. Supp. 2d 886, 895 (N.D.Ill. 2006) (stating that a
claimant must show a loss in at least two of these areas).

Here, the ALJ looked at this threshold requirement and determined that Damit
"has no deficits in adaptive functioning." (R. 89.) She made this determination based
on her findings that Damit takes the bus, can use the computer and takes care of

household chose. The ALJ also stated that Damit's abilities "are beyond what would be considered deficient with regard to adaptive functioning" in light of her "past work in accounts payable where she verified invoices against reports to determine accuracy... provided documents and [performed] data entry." We find that the ALJ's determination that Damit did not have a deficiency in adaptive functioning was reasonable. *See Washington*, 2014 WL 2135969, at *18-19 (finding no error in the ALJ's paragraph C determination when the ALJ found no deficiency in adaptive functioning because claimant was independent in daily activities, helped with household chores, took care of persona needs, took public transportation alone). Because she made this threshold determination, it was not necessary for the ALJ to move on and examine the additional criteria in Paragraph C. *See Id.*

Damit argues that she does meet the threshold criteria because there is evidence that she does have a deficiency in adaptive functioning. She notes that she reads at a 5th grade level, her math is at a 2nd grade level and she does not like to be around others. She also noted that she suffers from a mood disorder, she does not communicate very well and she has been referred to a psychiatrist. We disagree. Instead, we find that the ALJ reasonably analyzed the evidence in the record and built the requisite logical bridge demonstrating the reasoning behind her conclusions. The ALJ discussed the evidence in the record that demonstrates that Damit does not have a deficiency in adaptive functioning. Indeed, even Damit's counsel at the hearing acknowledged as much when he stated he could not rely on Section 12.05 because "she has a pretty good work record, and so adaptability seems to be quite good." (R.

17

21.) For these reasons, and because the ALJ adequately discussed the threshold criteria in listing 12.05, her failure to find that Damit meets the criteria in Paragraph C was not unreasonable and does not require remand.

## 2. The ALJ's RFC Analysis Was Supported By Substantial Evidence

Damit next argues that the RFC analysis was not supported by substantial evidence because the ALJ did not properly weigh and analyze the medical opinion evidence in the record. Damit asserts that the ALJ ignored results of Dr. McGovern's psychological evaluation which placed her in the "borderline" to "extremely low" range. She also notes that Dr. McGovern diagnosed her with mild mental retardation and mood disorder and found her Full Scale IQ score to be 68. In light of these facts, Damit argues that remand is appropriate here.

We disagree with Damit that Dr. McGovern's findings demonstrate that the ALJ's RFC analysis was not supported by evidence. Contrary to Damit's assertions, Dr. McGovern in fact found that Damit *was* capable of working in "office, clerical and food service occupations," and that she could perform "jobs that are well-structured and have a minimum of ambiguity." Accordingly, the ALJ correctly noted that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (R. 92.) In addition, in her RFC analysis, the ALJ noted that Damit's daily activities included looking for jobs in the newspaper or online, and doing volunteer work, and her work around the house included laundry, reading, making jewelry, scrapbooking, preparing meals, and pulling weeds. The ALJ also relied on her past, successful work

18

experience. Based on the ALJ's discussion of these factors, we find the ALJ's RFC determination was more than reasonable. *See, e.g., Witt v. Barnhart,* 446 F. Supp. 2d. 886, 896 (N.D. Ill. 2006) ("In the context of mental retardation, an ability to hold a job is particularly useful in determining the individual's ability or inability to function in a work setting.").

In addition, the ALJ noted that Dr. McGovern found that she had low IQ scores, but also reported that she was "alert, attentive, cooperative and logical." (R. 92, citing Dr. McGovern's report.) Although the ALJ did question the evidence that her math and reading levels were very low, given the fact that she had previously worked as a cashier and she said she frequently read and understood John Grisham novels. However, the ALJ factored in these limitations in her RFC, and limited her to jobs where she can "understand, remember and carry out simple instructions," and "make simple work related decisions." In addition, consistent with Dr. McGovern's findings, the ALJ aslo limited her to jobs that only require a 5th grade reading level and a 2nd grade math level. (R. 89.) Also consistent with Dr. McGovern's diagnosis of mood disorder, the ALJ limited Damit's work to jobs with no public contact. Therefore, Damit's assertion that the ALJ improperly ignored Dr. McGovern's report is unpersuasive.

Damit also argues that Dr. Brauer's findings are also inconsistent with the ALJ's findings. However, the ALJ specifically noted that she was placing "great weight" on Dr. Brauer's findings and again, she incorporated additional limitations on claimant's RFC, in light of Dr. Brauer's report. (R. 92.) Therefore, we find that the ALJ adequately

articulated her reasoning for finding that Damit was capable of sedentary work with the additional limitations.

### 3. The ALJ's Credibility Analysis Does Not Require Remand

Next, Damit argues that the ALJ's credibility analysis is not supported by substantial evidence. As an initial matter, we note that the SSA has recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993). In determining whether a new rule constitutes a clarification or a change, courts give "great weight" to the stated "intent and interpretation of the promulgating agency." *Id.* at 483. Though a statement of intent is not dispositive, the courts defer to an agency's expressed intent to "clarify" a regulation "unless the prior interpretation…is patently inconsistent with the later one." *Id.*; *see also First Nat. Bank of Chicago v. Standard Bank and Trust*, 172 F.3d 472, 479 (7th Cir. 1999); *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408 (7th Cir. 1987).

Here, the SSA has specified in its new SSR that its elimination of the term "credibility" in subjective symptom evaluation is intended to "clarify" its application of existing rules and to "more closely follow our regulatory language regarding symptom

20

evaluation." SSR 16-3p, 2016 WL 1119029 at *1. Moreover, the two SSRs are not patently inconsistent. Indeed, a comparison of the two reveals substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms. *Compare* SSR 16-3p and SSR 96-7p. Stated differently, "[t]he agency has had only one position, although it has expressed that position in different words." *Homemakers N. Shore, Inc.,* 832 F.2d at 413. Therefore, it is appropriate to evaluate claimant's credibility argument in light of the guidance the Administration has provided in SSR 16-3.

It remains the case that because the ALJ is in the best position to determine a witness's truthfulness and forthrightness, the court will not overturn an ALJ's credibility determination unless it is "patently wrong." *Shideler v. Astrue,* 688 F.3d 306, 310-11 (7th Cir. 2012). Under SSR 16-3, the ALJ must still consider all of an individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record. In assessing symptoms, the ALJ should consider elements such as "objective medical evidence of the impairments, the daily activities, allegations of pain and aggravating factors, functional limitations, and treatment (including medication)." *Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir. 2006); SSR 16-3, 2016 WL 1119029.

Turning to Damit's credibility argument here, she states that the ALJ improperly discredited her testimony when fashioning the RFC. Damit first states that the ALJ's reliance on her activities of daily living was improper because the Seventh Circuit has held that activities of daily living does not necessarily mean a claimant is able to perform

in an employment setting. While this is a correct recitation of the case law, we do not find that remand is warranted here because this was not the ALJ's only grounds for determining claimant's RFC. We find that the ALJ also adequately discussed the other factors she was taking into account when determining her RFC, in addition to her activities of daily living. The ALJ noted her testimony that she could read novels, she was never laid off from a job for her work performance, she has consistently looked for employment and she has regularly volunteered work at PetSmart. For these reasons, the ALJ found that Damit's claim that she was unable to work were not credible. We are not persuaded that this finding is patently wrong.

Damit also argues that the ALJ improperly discredited her testimony about having poor math skills. The ALJ did state that this was questionable because she had experience as a cashier; however, although the ALJ questioned this testimony, she nevertheless took it into account when she limited Damit's work to a 2nd grade math level consistent with Dr. McGovern's findings. Therefore, this is not grounds for a remand.

In her last argument regarding the ALJ's credibility finding, Damit appears to be claiming that remand is warranted because the ALJ incorporated certain boilerplate language in her analysis. It is true that the Seventh Circuit has called this language "meaningless boilerplate" because it fails to direct a reviewing court to what the ALJ relied on when making his determination. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if she otherwise

points to information that justifies her credibility determination. *See Shideler v. Astrue,*
688 F.3d 306, 311-12 (7th Cir. 2012); *see also Getch v. Astrue,* 539 F.3d 473, 483 (7th
Cir. 2008) ("Reviewing courts ... should rarely disturb an ALJ's credibility determination,
unless that finding is unreasonable or unsupported."). The ALJ did that here.

As we have noted above, the ALJ discussed at length the reasons for her
credibility finding.[1] *See Webb v. Astrue,* 2013 WL 139897, at *24 (N.D. Ill. Jan. 10,
2013) (use of boilerplate language does not require remand where the ALJ provided
three reasons for finding that claimant was not credible). Moreover, even where she
found certain testimony not credible, she nevertheless added additional limitations in the
RFC analysis to account for this testimony. The ALJ's decision allows us to trace the
path of her reasoning to her conclusions. For these reasons, the ALJ's use of the
boilerplate language does not require remand.

### 4. The ALJ's Step 5 Analysis Does Not Require Remand

Finally, Damit argues that the ALJ's step 5 determination is not supported by
substantial evidence. At step 5, the ALJ relied on the testimony of the VE when she
determined that Damit could perform jobs that existed in significant numbers in the
national economy. Damit argues that this was improper because the ALJ asked the VE
questions based on the ALJ's errors in determining her RFC and her credibility finding.
Because we have already determined that the ALJ's RFC and credibility determinations
were not unreasonable, this argument is not persuasive.

---

[1]We find that the ALJ adequately addressed claimant's physical limitations as
well; however, again because Damit did not raise any issues with these findings, we do
not address them here.

Second, Damit argues that the ALJ's hypothetical to the VE failed to include Dr. McGovern's opinion that claimant would need up to 25% additional time to complete tasks. However, we agree with defendant that Damit is overstating Dr. McGovern's opinion. In his report, Dr. McGovern noted that with respect to Damit's math abilities, it would be beneficial if she had "up to 25% extra time to complete tests and out of class assignments and ..the use of a calculator." (R. 276.) As we have discussed above, the ALJ factored this into her RFC analysis when she determined that Damit was limited to jobs that required no more than 2nd grade math. For this reason, Damit's final argument is unpersuasive as well.

## III. CONCLUSION

For the reasons set forth above, Damit's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted. It is so ordered.

**ENTERED:**

**Dated: June 24, 2016**

_Michael T. Mason_

**The Honorable Michael T. Mason**
**United States Magistrate Judge**